# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

United States of America
The State of Florida
ex rel. David Robbins,

Plaintiffs,
v.

Halifax Hospital Medical Center,
Halifax Staffing, Inc.,
Hassan Zulfiqar, MD
Kirsten S. Kim, MD.

Defendants

_____/



CASE NO. _____
6:18-cv-633-ORL-28 DCI

**FILED UNDER SEAL**

**Demand for Jury Trial**

## COMPLAINT

Halifax paid remuneration to a referring physician by forgiving approximately $500,000 in obligations owed to Halifax by the physician's spouse.

Mr. Robbins, performing his job as the Physician Contracts Manager, investigated and sought to bring this illegal transaction to light.

Halifax fired Mr. Robbins with the objective of hiding the remuneration because it violated the Stark Law, the Anti-Kickback Statute, and Halifax's Corporate Integrity Agreement.

I.  Jurisdiction, Venue, and Parties ................................................................3

II.  The Law ..................................................................................................8

    A.  Medicare, Medicaid, and Tricare/CHAMPUS ..................................8

    B.  The Anti-Kickback Statute ..............................................................9

    C.  The Stark Law ................................................................................12

    D.  The Federal and Florida False Claims Acts ..................................15

    E.  Corporate Integrity Agreement Violations Can Trigger False Claim Act Liability .17

III.  Defendants' Misconduct ......................................................................18

    A.  Background and Overview ..............................................................18

    B.  Chronology of Relevant Events ......................................................20

    C.  Debt Forgiveness Directly Compensated Dr. Zulfiqar Under the Stark Law ......28

    D.  Dr. Kim's 2018 Agreement Violated the AKS ................................30

        1.  Halifax evidenced intent in the February 2018 Agreement.................................31

        2.  Halifax evidenced intent by falsifying the Contract Cover Sheet. .......................33

        3.  The Committee never fully studied or approved the waivers. ..............................34

    E.  Drs. Zulfiqar and Kim Knew Their Stark and AKS Responsibilities .....................35

    F.  Halifax Files Zulfiqar-Referred Claims With Medicare ...........................38

    G.  Halifax Acted "Knowingly" When it Certified FCA and CIA Compliance.........43

    H.  Halifax Retaliated Against and Wrongfully Discharged Mr. Robbins .................45

IV.  Counts ..................................................................................................46

        1.  Presenting or Causing False or Fraudulent Claims, § 3729(a)(1)(A) .................46

        2.  Halifax Defendants' False Records or Statements, § 3729(a)(1)(B)....................46

        3.  Halifax Avoided an Obligation to Refund, 31 U.S.C. § 3729(a)(1)(G) ..............47

        4.  Halifax's Retaliation Against Mr. Robbins, 31 U.S.C. § 3730(h) .......................48

        5.  All Defendants' Violations of the Florida False Claims Act ................................49

V.  Prayer for Relief ....................................................................................50

1.     Qui tam Plaintiff-Relator David Robbins, through his attorney, brings this Complaint on behalf of the United States and the State of Florida, and on his own behalf, pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3730 *et seq.*, and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.*, based on Halifax's payment of unlawful remuneration to a referring physician in violation of the Stark Law and the Anti-Kickback Statute.

### I.     Jurisdiction, Venue, and Parties

2.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The Court has personal jurisdiction over the Defendants because Defendants transact business in this district, can be found in this district, and committed acts within this district that violate 31 U.S.C. § 3729.

3.     The "allegations or transactions" set forth in this Complaint have not been publicly disclosed so as to require dismissal of the Complaint under 31 U.S.C. §3730(e). Mr. Robbins, moreover, qualifies as an "original source" of the allegations detailed in this Complaint even had such a public disclosure occurred. *Id.*

4.     Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. 1391(b) and (c) because at all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

5.      Defendants' conduct had a material effect on government-funded health plans' decisions to pay for services performed by Defendants. Had the United States known that Defendants misrepresented the schemes described herein, government-funded health plans would not have paid or made reimbursements.

6.      The allegations of this Complaint have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

7.      Mr. Robbins is an original source of the information upon which this Complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein. Indeed, he is the prototypical insider with personal knowledge and a unique understanding of Defendants' physician contract compliance (and noncompliance) procedures.

8.      Mr. Robbins provided disclosure of the allegations of this Complaint to the United States and Florida prior to filing under the federal False Claims Act and Florida False Claims Acts, respectively.

9.      The real parties in interest to the claims of this action are the United States of America and the State of Florida.

10.     **Qui Tam Plaintiff/Relator David Robbins** is a Florida resident. He worked for Halifax in Daytona Beach, Volusia County, Florida, from October 2014 to March 2018.

11.     Mr. Robbins served as the "Physician Contracts Manager" under Halifax's

current Corporate Integrity Agreement ("CIA"), an agreement executed between

Halifax and the U.S. Government concerning Halifax's violations of the Anti-

Kickback Statute and Stark Law. His job summary provided:

> Job Summary: Monitor focus arrangements, as defined in the Halifax
> Health Center Corporate Integrity Agreement (CIA), and ensure related
> payments are reviewed, approved and processed in compliance with
> internal policies and procedures and in accordance with the terms of the
> CIA.

Ex. B, Job Description

12.     Among his responsibilities were to:

- Review each "Focus Arrangement" to ensure the arrangement is
  consistent with the terms of the CIA, the stated Stark exception and
  other applicable state and federal laws.
- Review each payment requested in connection with a "focus
  arrangement" to ensure the payment is consistent with the terms of
  the agreement, the terms of the CIA, the stated Stark exception and
  other applicable state and federal laws.
- Prepare or review biannual FMV analyses for "focus arrangements."

Ex. B, Job Description

13.     His reports were intended to be provided to the CIA-mandated Legal

Independent Review Organization (LIRO). Halifax agreed these communications

would not be shielded by attorney-client privilege. Ex. A, CIA Appendix A

14.     Before this position, Mr. Robbins's other jobs included employment with The

Archbold Medical Center, Inc. in Thomasville, Georgia as the senior VP for legal

affairs, and as a Washington, DC-based partner at the Duane Morris law firm. Mr.

Robbins earned his JD from George Washington University, National Law Center; and

MBA from Temple University in Healthcare Administration and Management Science.

15.     Mr. Robbins served in the United States Air Force Medical Service Corps. as the Financial Officer for the Kadena Clinic, Kadena Air Base, Okinawa, Japan from 1978 to 1980, then from 1980 to 1981 he served as the Operating Officer for the Hanscom Air Base Clinic in Lexington, MA. He was honorably discharged and was in the inactive reserves for six additional years.

16.     With respect to each allegation herein made *upon information and belief*, Mr. Robbins has, based upon his knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it. While Mr. Robbins has significant evidence of the fraud alleged herein (the details of which follow), much of the documentary evidence necessary to prove the allegations in this Complaint is in the possession of the Defendants, the United States, or Florida.

17.     **Defendant Halifax Hospital Medical Center** a/k/a Halifax Medical Center a/k/a Halifax Health a/k/a Halifax Community Health System ("Halifax Hospital") was created under Florida law as a special taxing district. Pursuant to its enabling statute, Halifax Hospital funds its operation through revenue generated from services performed in its facilities, ad valorem taxes levied on the special taxing district's residents, and revenue from the sale of bonds.

18.     Halifax Hospital owns and operates hospitals and medical facilities in Volusia County, Florida and surrounding counties. Halifax Hospital's primary business is to provide inpatient and outpatient healthcare services.

19.     Although Halifax Hospital enjoys tax-free status as a "nonprofit" entity, its 2016 "net position" (what for-profit entities refer to as retained earnings) was $282 million dollars, and its 2016 revenue less expenses (profit) exceeded $35 million dollars, same as 2015. Ex. C at 6 and 7, Halifax Hospital Medical Center Financial Report, September 30, 2016.

20.     **Defendant Halifax Staffing, Inc.** is is a wholly owned subsidiary of Halifax Hospital. Halifax Staffing provides staffing services to Halifax Hospital in exchange for payments from Halifax Hospital to cover the cost of employee salaries and benefits and administrative costs. Halifax Hospital operates Halifax Staffing. It is an instrumentality and alter ego of Halifax Hospital. [1]

21.     "Halifax" is defined as Halifax Hospital Medical Center a/k/a Halifax Medical Center a/k/a Halifax Health ("Halifax Hospital"); and Halifax Staffing, Inc.

22.     **Defendant Hassan Zulfiqar**, MD, NPI 1487684171, Florida professional license ME78417 is a physician based out of Port Orange, Florida, specializing in Gastroenterology, and married Defendant Kim October 10, 2014. He practices medicine through IMACS, LLC. IMACS, LLC is not a party in this case.

---

[1]     "Simply stated, aside from its employment of the people who operate Halifax Hospital, there is no Halifax Staffing. Halifax Staffing has no employees other than those it leases to Halifax Hospital, and the Board of Commissioners of Halifax Hospital also serves that role for Halifax Staffing." *United States v. Halifax Hospital Medical Center*, Docket No. 6:09-cv-1002-Orl-31TBS, 2013 U.S. Dist. LEXIS 167882, at *19 (M.D. Fla. Nov. 26, 2013).

23.    **Defendant Kirsten Kim**, MD. 1497017289, Fl professional license ME117574 is a physician based out of Port Orange, Florida and is married to Defendant Zulfiqar since October 10, 2014.

## II.    The Law

### A. Medicare, Medicaid, and Tricare/CHAMPUS

24.    In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. The Center for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services ("HHS"), administers Medicare.

25.    To participate in the Medicare program, healthcare providers enter into contracts with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act ("SSA") and Title 42 of the Code of Federal Regulations ("CFR").

26.    Among the most crucial legal obligations of participating providers is the requirement that prohibits a provider from making false statements or misrepresentations of material facts concerning payment requests. 42 U.S.C. §§ 1320a-7b(a)(1)- (2); 42 C.F.R. 413.24(f)(4)(iv).

27.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with

minimum standards in the administration of the program. Medicaid covers hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

28.     By becoming a participating provider in Medicaid, Halifax agreed to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information by Medicaid.

29.     TRICARE/CHAMPUS is a federally-funded program that provides civilian health benefits, including hospital services, to U.S Armed Forces military personnel, military retirees, and their dependents, including some reservists.

30.     A facility seeking reimbursement from TRICARE/CHAMPUS is required to submit a request for reimbursement which is derived in part from the Medicare cost report for that facility. This request for reimbursement requires that the provider expressly certify that the information is "accurate and based upon the hospital's Medicare cost report." Consequently, whenever a hospital's Medicare submissions contain false data or information, the corresponding reimbursement requests submitted to TRICARE/CHAMPUS are also false.

**B.  The Anti-Kickback Statute**

31.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibits, among other things, paying kickbacks to induce referrals for services paid under federal health care programs.

32.     The AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions corrupt professional healthcare decision-making and

may result in federal funds being diverted to pay for goods or services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. It is designed to ensure that federal health programs reimburse for goods and services provided in the best interests of patients, rather than in the financial interests of healthcare providers.

33.     The AKS prohibits kickbacks in order to protect the integrity of the federal health care programs from *difficult to detect kickbacks masquerading as legitimate transactions. See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

34.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical items and services, including items and services provided under the Medicare program, state Medicaid and Tricare, among others. In pertinent part, the statute states:

> (b) Illegal remuneration
> * * *
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) *directly or indirectly, overtly or covertly*, in cash or in kind to any person to induce such person-
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which

payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). [Emphasis supplied]

35.    The AKS does not define "remuneration" except to say that it includes "any kickback, bribe, or rebate," and that it may be direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. 1320a-7b(b). Under the interpretation of the Office of the Inspector General for the Department of Health and Human Services, "remuneration" under the AKS means "anything of value in any form whatsoever." OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991). This broad definition can include forgiveness of a loan if one purpose of such benefit is to induce referrals.

36.    Violation of the AKS statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7(a)(7).

37.    The United States has deemed compliance with the AKS to be material to its decision to pay healthcare claims, in part through its requirement that providers certify compliance with this law as a condition of payment under, and participation in, Government healthcare programs.

38.    A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

39.     Once a hospital forms a financial relationship with a referral source through the offer of remuneration, and if any purpose of that remuneration is to induce referrals, the AKS is violated.

40.     For the purpose of government healthcare reimbursement, the relevant inquiry is whether *any purpose* of the remuneration exchanged or offered was to induce referrals. If even *one purpose* was to induce referrals of Medicare or Medicaid patients, the agreement violates the AKS.

41.     The State of Florida's Anti-Kickback Statute and related laws also prohibit kickbacks  and parallel the Federal Anti-Kickback Statute in most respects. § 456.054, Fla. Stat. *See* Fla. Stat. § 409.920(2)(a)(5) (prohibiting Medicaid provider kickbacks) and Fla. Stat. § 395.0185 (prohibiting hospital "rebates").

**C. The Stark Law**

42.     The Stark Law, 42 U.S.C. §1395nn, also known as the Physician Self-Referral Law, prohibits an entity providing healthcare items or services from submitting claims for payment to Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" with the referring entity.

43.     Regulations implementing 42 U.S.C. § 1395nn, expressly make it illegal for anyone to receive federal payment for a healthcare service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 *et. seq.*

44.    The Stark Law prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute.

45.    The Stark Law was intended to prevent physicians from profiting (actually or potentially) from their own referrals. It *prospectively* prohibits relationships that have been demonstrated to encourage over-utilization of medical services. It is a strict-liability statute.

46.    Most exceptions require that any remuneration flowing between entities and physicians be at fair market value for actual and necessary items furnished or services rendered based on an arms-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

47.    The Stark Law itself does not distinguish between "direct" and "indirect" compensation arrangements, but simply defines "compensation arrangement" as "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C)." 42 U.S.C. § 1395nn(h)(1)(A).

48.    Compliance with the Stark Law is a condition of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded

programs and claims submitted or caused to be submitted in violation of the Stark Law are false claims.

49.     Each of the federally funded healthcare programs requires every provider who seeks payment from the program to sign a Provider Agreement in order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs. As part of these agreements, without which the providers may not seek reimbursement from federal healthcare programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

50.     When a provider submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-Kickback Statute and the Stark Law.

51.     Every Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS

-14

REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____ {Provider Name(s) and Number(s)} for the cost reporting period beginning _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.
(Signed) _____
Officer or Administrator of Provider(s) _____
Hospital Cost Report (CMS-2552-96 and CMS-2552-10) [all caps, Original].

## D. The Federal and Florida False Claims Acts

52.    With the enactment of the federal False Claims Act, Congress recognized the benefits of incentivizing integrity and repeatedly amended the Act to further enhance the ability of the U.S. Government to recover losses to the federal treasury sustained as a result of fraud.

53.    Congress intended that the False Claims Act amendments enhance incentives for individuals with knowledge of fraud against the federal government and encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

54.     Congress has found that fraud in federal programs is pervasive and has

recognized the False Claims Act as the government's primary tool for combating

government fraud.

55.     The False Claims Act prohibits the submission of false or fraudulent claims and

false statements in order to obtain or keep federal money. It provides, in pertinent part:

> (a) Liability for Certain Acts.—
> (1) In general.— Subject to paragraph (2), any person who—
> (A) knowingly presents, or causes to be presented, a false or fraudulent
> claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record
> or statement material to a false or fraudulent claim;
> * * *
> is liable to the United States Government for a civil penalty of not less
> than $5000 and not more than $10,000, as adjusted by the Federal Civil
> Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount
> of damages which the Government sustains because of the act of that
> person.

31 U.S.C. § 3729(a) (2009).

56.     The Florida False Claims Act ("Florida FCA") is modeled after the FCA and

similarly prohibits a person from knowingly submitting false or fraudulent claims to

the state government. Fla. Stat. §§ 68.081 *et seq.*

57.     The Federal and Florida Acts allow any person having knowledge about a false

or fraudulent claim against the government to bring an action for himself and the

government, to share in any recovery, and to recover reasonable costs, expenses, and

attorney's fees from the defendant if the action is successful.

### E.  Corporate Integrity Agreement Violations Can Trigger False Claim Act Liability

58.     Material violations of a Corporate Integrity Agreement ("CIA") can trigger False Claim Act liability.

59.     The Halifax CIA defines a material breach to include a failure by Halifax to report certain violations of the agreement (defined as "Reportable Event"), take corrective actions, or make the appropriate refunds, as required in the CIA § III.J. Ex. A. Halifax agreed that material breaches can trigger CIA penalties, such as the CIA's $1,000 per day penalties for untimely compliance with certain provisions, and even exclusion from government programs including Medicare.

60.     Many of the CIA's affirmative disclosure requirements are already legally mandated because 42 U.S.C.  § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

61.     Courts may find other breaches of the CIA material with respect to the False Claims Act. For example, because the CIA's express purpose was to set in place procedures to keep Halifax from risking further unlawful federal health care program business in violation of the Anti-Kickback Statute or the Stark Law, violations of those procedures could be deemed sufficiently material such that claims that include items

-17-

or services relating to those procedural violations may constitute false or fraudulent claims for purposes of the False Claims Act.

### III.   Defendants' Misconduct

#### A. Background and Overview

62.   Beginning around 2000 and for more than 10 years, Halifax entered into illegal compensation arrangements with physicians, specifically by paying physicians under contracts that exceeded fair market value, were not commercially reasonable, and/or took into account the volume or value of the referrals or other business generated between physicians and Halifax.

63.   In 2009, Ms. Elin Baklid-Kunz filed suit under the federal False Claims Act. The United States partially intervened, and Halifax vigorously defended, eventually expending more than $23 million on legal fees to avoid accountability for its illegal acts.

64.   In March 2014, Halifax settled the kickback portion of the case for $85,000,000. As part of the settlement, Halifax agreed to a stringent Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services, incorporated by reference and attached to this Complaint, in its entirety, as Exhibit A.

65.   In the 2007 CIA, Halifax promised the United States that it would establish and maintain a compliance program, develop and implement a business code of conduct

for all employees, and ensure its policies and procedures addressed, among other

things, compliance with the Stark Law and the Anti-Kickback Statute, including:

> g. implementing *effective responses when suspected* violations of the Anti-Kickback Statute and the Stark Law are discovered, including disclosing reporting events and quantifying and repaying overpayments ... when appropriate.

Exh. A at 13, CIA § III D(1)(g). [Emphasis supplied].

66.     The CIA required Halifax to report to the OIG any reportable events (matters

that a reasonable person would consider a probable violation of criminal, civil, or

administrative laws). CIA at 20, § III(J)(1)(a). The CIA's broad definition of

"reportable event" included even events that may be the result of an isolated event. *Id.*

Further, for reportable events involving the Stark Law, Halifax must report even

*probable* violations to CMS. *Id.* at 22, § III(J)(6).

67.     The CIA also contains detailed training and independent review requirements

regarding Halifax's policies and procedures, especially with respect to the

compensation of referring physicians. It also required a certification program by

Halifax's top executives that it was in compliance. Ex. A at 8, CIA § III (A)(5)

"Management Accountability and Certifications."

68.     In short, Halifax squarely promised the United States it would put an end to

improper financial relationships with referring physicians.

69.     Halifax hired Mr. Robbins to review physician contracts to ensure they

complied with the Stark Law and Anti-Kickback Statute and with Halifax's

government-imposed Corporate Integrity Agreement.

-19

70.     As detailed in the chronology below, Halifax improperly paid a referring physician, Dr. Hassan Zulfiqar, and/or his practice, IMACS, LLC, by forgiving an approximately $500,000 debt owed by Dr. Zulfiqar's wife, Dr. Kirsten Kim, a former Halifax employee.

71.     Because the $500,000 was neither commercially reasonable nor fair market value, Halifax sought to obscure the transaction from the CIA-mandated Legal IRO and the OIG.

72.     When Mr. Robbins investigated and sought to document the payment– the job he was hired for – Halifax fired him.

**B.  Chronology of Relevant Events**

73.     In March 2011, Halifax finalized a contract for services with IMACS, LLC, a gastroenterology services provider. Dr. Hassan Zulfiqar is a member of IMACS. Ex. D.

74.     In 2012, Dr. Kirsten Kim received her MD and on July 1, 2012, began working as a resident at Halifax Health Medical Center.

75.     In July 2014, Halifax Staffing and Dr. Kim executed a four-year employment contract, August 1, 2015 through July 31, 2019, at an annual salary of $210,000, plus a $25,000 signing bonus, plus RVU-based productivity bonuses. Ex. E. Although Halifax paid the signing bonus upfront, Dr. Kim agreed to repay pro rata any portion of the bonus if she did not complete her four years with the hospital. Ex. E, ¶ C and Ex. E's exhibits A and C.

76.    Significantly, unlike almost all other Halifax physician employment contracts for physician services, Dr. Kim's contract did not include the standard non-compete agreement. Instead, it included a Subsidy Repayment Obligation. *Id*. at 9, ¶ 15. The Subsidy Repayment Obligation required Dr. Kim to pay back any practice subsidy incurred by Halifax if she voluntary terminated the agreement prior to the end of the four-year term. *Id*. Not even death would "affect any liability or other obligation." *Id*. at 8, ¶ 14 D.

77.    In September, 2014, about a month later, Halifax and IMACS, Kim's husband's practice group, amended their agreement. Ex. F.

78.    On October 10, 2014, Dr. Kim and Hulfiqar married. Halifax knew of this marriage. The Halifax website notes their marriage and the birth of their daughter. Ex. G (Halifax website).

79.    In October, 2014, Halifax hired Mr. Robbins as a "Physician Contract Administrator" to perform services required by Halifax's Corporate Integrity Agreement. Under the terms of his employment, his job responsibilities were as follows:

> Job Summary: Monitor focus arrangements, as defined in the Halifax Health Center Corporate Integrity Agreement (CIA), and ensure related payments are reviewed, approved and processed in compliance with internal policies and procedures and in accordance with the terms of the CIA.

Ex. B.

-21

80.   Because Halifax hired Mr. Robbins a month after Halifax executed its agreements with Dr. Kim and her husband's practice group, IMACS, Mr. Robbins had no reason to monitor their "focus arrangements" until 2017.

81.   On June 16, 2017, Dr. Kim left her employment, left many patients' medical charts incomplete, and never returned to Halifax. However, until approximately the last week of February, 2018, Halifax's computerized document manager (Novatus) showed Dr. Kim's contract as "active."[2]

82.   On or about July 2017, Dr. Kim first came to Mr. Robbins's attention when she submitted a standard "disbursement request" seeking prepayment for an August conference.

83.   Mr. Robbins's due diligence in reviewing payments to physicians through disbursement requests involved his investigating the bona fides of the requests. As this was a request for prepayment rather than for reimbursement, Mr. Robbins called the Employed Physicians Management Office to determine why prepayment was necessary. Mr. Robbins was told that Dr. Kim had stopped working at Halifax in June of 2017.

84.   Because Dr. Kim was no longer working at Halifax, Mr. Robbins drafted a reimbursement denial but, before submitting it, he emailed Senior V.P. and General Counsel Vivian Gallo to inform her that he planned to deny the request. Ms. Gallo responded immediately telling him [paraphrasing]: *Don't do anything, I'm talking with*

---

[2]     Additionally, Halifax kept her on its website through at least January 2018.

*her and her attorneys.* Based on this, he took no further action, neither approving nor denying Dr. Kim's request.

85.     On September 13, 2017, the Physician Arrangements Review Committee ("PARC" or "Committee") met and discussed Dr. Kim, her departure, and her contract, including the practice Subsidy Repayment Obligation. Mr. Robbins recalls Bill Griffin estimating the subsidy obligation as exceeding $500,000. In addition, when asked about the nature of Dr. Kim's departure, Mr. Robbins recalls Jeanne Connelly, the Halifax Physician Practices Manager, explaining that Dr. Kim had walked out on June 16, 2017 and never came back. Ms. Connelly also stated that Dr. Kim was planning to go to work for Florida Hospital, Halifax's biggest competitor.

86.     Bob Wade, the Board Compliance Expert required by the CIA, stated that he thought waiving Dr. Kim's subsidy repayment obligation would be okay because it was an "unusual" requirement he had never seen before.[3] There was some discussion of this and someone, it might have been Shelly Shiflet, Halifax Compliance Officer, said something like [paraphrasing]: *Do you know that she's married to one of our biggest referring gastroenterologists.*" She (or someone) suggested that Bob's firm provide the Committee with a memorandum supporting the position that it would be okay to forgive Kim's practice debt. The Committee agreed with that suggestion.

---

[3]     "Isolated events" are reportable events. Ex. A at 20, CIA § III(J).

However, to the best of Mr. Robbins's knowledge, Mr. Wade never submitted the memorandum to the Committee and Mr. Robbins never heard about it again.[4]

87.    Bob Wade also requested documentation from Ms. Gallo to support forgiving the as-of-yet unforgiven portion of her signing bonus. No such documentation was ever provided to the Committee and Mr. Robbins never heard about it again.

88.    The minutes of the September 13, 2017 meeting do not detail these discussions. They reference a *proposed* agreement with Dr. Kim that Ms. Gallo had already drafted that would forgive Dr. Kim the amounts owed for her practice subsidy and signing bonus repayment obligations.

89.    The Committee rejected Ms. Gallo's proposed agreement and asked her instead to draft a memorandum for the Committee, documenting support for forgiving all amounts then owed by Dr. Kim. No such memorandum was presented to the Committee in any subsequent meeting.

90.    On September 27, 2017, the Physician Arrangements Review Committee met and again discussed Dr. Kim.

91.    General Counsel, Vivian Gallo, informed the Committee that Dr. Kim was not going to work for Florida Hospital and that Dr. Kim's position on the subsidy was that any loss sustained by Halifax was its own fault because Halifax had not appropriately supported her medical practice. Ms. Gallo claimed there was documentation from Dr.

---

[4]    Relator recalls who said what, as noted, but he is not as clear whether something might have been said on September 13, or 27. This lack of specific date recollection does not impact any of the conclusions on which the allegations are based.

Kim supporting this position. Mr. Robbins requested that the documentation be presented to the Committee and made part of the record. That never happened. Mr. Robbins never heard anything further about this documentation.

92.     The meeting's minutes reflect none of the preceding discussions. The Committee requested Ms. Gallo to draft a memo documenting support for moving forward with the agreement.

93.     One of the reasons the Committee declined to approve the draft agreement was the omission of CIA-mandated compliance language. As discussed below, this was never properly completed.

94.     At the October 25, 2017 PARC meeting, the Committee reviewed another draft of Dr. Kim's waiver agreement and questioned whether Dr. Kim had ever finished the outstanding charts she left unfinished when she abruptly left her job in June.

95.     The Committee again declined to approve the draft. They asked Ms. Gallo to work with Eric Peburn, the CFO, and Ms. Connolly, the Physician Practices Manager, to revise the draft.

96.     Committee approval was conditioned on verification of no outstanding charts and correction of the timeline. But there was no approval of the draft as presented. Mr. Robbins doesn't know if Dr. Kim ever did the charts because the Committee was never informed. Nor did the Committee ever see a revised timeline, supporting memo, or final draft of the Agreement.

97.     In late January or early February 2018, Mr. Robbins had his assistant Nancy

Cameron (physician contract supervisor), pull a report on 2017 services provided by

IMACS, LLC, and Dr. Kim's husband Dr. Hassan Zulfiqar. Mr. Robbins requested this

information to see how large a referral source IMACS and Dr. Zulfiqar were for

Halifax.

98.     The *Cases by Physician* report for January – December 2017 shows 3,751

IMACS cases, of which 21%, 796 cases were submitted by Dr. Zulfiqar. Ex. H.

99.     On February 1, 2018, Dr. Kim and Halifax finalized an Agreement waiving her

debt obligations. Ex. I, 2018 Agreement.

100.    From January through mid-February 2018, Mr. Robbins did not know that the

2018 Agreement had been finalized and executed. Consequently, he continued to

attempt to investigate the Kim transaction. Most of January, the document

management system showed Dr. Kim's employment status as "active," despite her not

having worked a day since June 14, 2017. For most of February, he did not learn Dr.

Kim's 2018 Agreement was executed and finalized because it had not been entered in

Novatus, Halifax's CIA-mandated document system. During this period, Mr. Robbins

twice requested from Deb Kreimer, who managed all PARC documents, to find out if

any of the promised documentation on Dr. Kim had been submitted. Ms. Kreimer

advised him that none had been submitted.

101.    Mr. Robbins continued his investigation because he suspected that Halifax may

have been motivated to totally forgive everything owed by Dr. Kim, at least in part, to

-26

assure continued referrals and good business relations with IMACS and Dr. Zulfiqar. His belief was based on the changing facts presented to PARC, the unfulfilled promises for supporting documentation, and what Mr. Robbins perceived as the secrecy surrounding the Kim issue since the October 25, 2017 PARC meeting.

102.    The timing was critical for Mr. Robbins because, as required by the CIA, the Legal Independent Review Organization (LIRO) was due to provide Halifax with the list of 75 focus arrangements to be audited in March or early April. Mr. Robbins's performance was largely judged by the outcome of these annual audits. During the previous two years' Legal IRO audits, Mr. Robbins's work was judged perfect and accepted by Legal IRO as properly documented. Mr. Robbins was concerned that if Dr. Kim would be one of the 75 chosen for audit, Mr. Robbins could not submit the documents required to Legal IRO because, for most of February, the *only* document that existed was Dr. Kim's original employment agreement. Through much of February 2018, the Novatus document management system still showed this agreement as "active," despite Dr. Kim's not having worked a day since June 14, 2017.

103.    During the last week of February 2018, Mr. Robbins accessed Halifax's computerized document manager (Novatus), which until then had shown Dr. Kim's original employment contract as "active." He found it now designated as "inactive." For the first time— nearly a month after it had been executed— Mr. Robbins also found the 2018 Agreement, which had just been loaded into Novatus.

104.    Based on his review of the 2018 Agreement and the lack of supporting

documents, Mr. Robbins planned to challenge the Agreement at the next PARC

meeting, which was scheduled for the following week, Wednesday, March 7, 2018. He

was aware this would be controversial as unanimity was required for all approvals. To

the best of his knowledge, this would be the first such challenge by any member of the

Committee since he was hired.

105.    On Thursday, March 1, Halifax summarily terminated Mr. Robbins's

employment as Physician Contracts Manager.

106.    Kim Fulcher, Senior VP of Human Resources for Halifax, contacted Mr.

Robbins at approximately noon, told him "we have to part company immediately" and,

after a brief discussion in which Ms. Fulcher offered a pretext rationalization, he was

escorted out of the building. He was not allowed to return to his office and not even

allowed to reenter his office to retrieve the many personal items that he had

accumulated over more than three years' employment.

107.    March is typically the month during which the Legal IRO submits to Halifax

the list of 75 focus arrangements to be audited. Because he had been terminated days

before the March 7 Committee Meeting, Mr. Robbins had no opportunity to challenge

the undocumented $500,000 waiver of Dr. Kim's debt repayment obligation and the

waiver of the repayment of her signing bonus.

**C. Debt Forgiveness Directly Compensated Dr. Zulfiqar Under the Stark Law**

108.    With certain exceptions, the Stark Law prohibits physicians who have *financial*

*relationships* with an entity from making referrals for designated health services to that

-28-

entity, and it prohibits the entity from submitting claims for payment resulting from such referrals. 42 U.S.C. § 1395nn(a)(1).

109.   The Stark Law itself does not distinguish between "direct" and "indirect" compensation arrangements, but simply defines "compensation arrangement" as "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C)." 42 U.S.C. § 1395nn(h)(1)(A).

110.   Regulations define "direct compensation arrangement" as a financial relationship.

> (i) A direct compensation arrangement exists if remuneration passes between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS without any intervening persons or entities.
> (ii) Except as provided in paragraph (c)(3)(ii)(C) of this section, a physician is deemed to "stand in the shoes" of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -
> (A) The only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and
> (B) The physician has an ownership or investment interest in the physician organization.
> (iii) A physician (other than a physician described in paragraph (c)(1)(ii)(B) of this section) is permitted to "stand in the shoes" of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if the only intervening entity between the physician and the entity furnishing DHS is his or her physician organization.

42 C.F.R. § 411.354(c)(1)

111.   Remuneration passed from Halifax to Drs. Kim and Zulfiqar.

112.   Unlike Dr. Kim's original employment agreement with Halifax Staffing, both Halifax Hospital and Halifax Staffing were parties to the 2018 Agreement. Ex. I.

113.    The remuneration arising from the forgiveness of the subsidy repayment obligation and forgiveness of the signing bonus is considered to have passed directly to Dr. Kim's husband because he is a member of her immediate family. 42 U.S.C. § 1395nn(h)(1)(A); 42 C.F.R. § 411.354(c)(1).

114.    Dr. Hassan Zulfiqar refers to and receives designated health services from Halifax Hospital. *See* Halifax Files Zulfiqar-Referred Claims With Medicare, at 38.

**D.  Dr. Kim's 2018 Agreement Violated the AKS**

115.    Halifax knowingly and willfully *offered* remuneration to doctors Kim and Zulfiqar in violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b)(2). On information and belief, this offer occurred between June 16, 2017, the day Dr. Kim stopped working, and September 11, the date of the Physician Arrangements Review Committee meeting in which Vivian Gallo presented a draft agreement showing Halifax's offer to forgive amounts owed for practice subsidy and signing bonus repayments in exchange for a 20-month noncompetition commitment.

116.    Halifax knowingly, willfully, and covertly *paid* remuneration to doctors Kim and Zulfiqar in violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b)(2). This payment occurred February 1, 2018, when Halifax and Dr. Kim finalized the 2018 Agreement.

117.    Dr. Zulfiqar was never a Halifax employee at any time relevant to this Complaint.

-30-

118.    On information and belief, Dr. Kim's employment ceased on or about June 16, 2017, the date she ceased providing physician services. Dr. Kim was not a Halifax "employee" as used in 42 C.F.R. § 1001.952, which incorporates by reference the same common law meaning as it does for purposes of 26 U.S.C. § 3121(d)(2).

119.    Because Halifax offered and paid remuneration to Dr. Kim, her husband, Dr. Zulfiqar, who indirectly received this benefit, also was offered and or paid remuneration. The Anti-Kickback Statute prohibits direct and *indirect* kickbacks.

120.    The Anti-Kickback Statute prohibits a doctor from receiving kickbacks that are made in return for a referral. It does not require that the referral be made in return for a kickback.

### 1.  Halifax evidenced intent in the February 2018 Agreement.

121.    Halifax evidenced intent to induce referrals by waiving and obscuring the Subsidy Repayment Obligation. Ex. I, 2018 Agreement at ¶ 3.

122.    Conspicuously missing from the 100% waiver of the Subsidy Repayment Obligation is the amount of the obligation (over $500,000). In describing the subsidy, it notes that some factors that increase the subsidy were not within Dr. Kim's control. However, this acknowledges other factors were in her control, but fails to make this clear, or to explain why Halifax chose to fully relieve her of obligations triggered by her breach of her Employment Contract.

123.    Halifax evidenced intent to induce referrals by waiving the signing bonus repayment obligation. Ex. I 2018 Agreement at ¶¶ 2, 4, and 5. Although it required

that she not compete for 17 months, through July 2019, this was sham consideration as it was not fair market value or commercially reasonable exchange. Indeed, the 2018 Agreement suggests as much, noting her inexperience and practice management losses. It is implicit in these statements that Dr. Kim could not have been a competitive threat to Halifax or taken business away from them and, thus, her promise was an empty promise and not consideration for the "deal."

124.   The Agreement mischaracterizes Dr. Kim as "Employee." But Halifax knew she ceased employment when she "ceased providing physician services" more than seven  months earlier, on June 16, 2017. Ex. I, 2018 Agreement, fourth "Whereas."[5] 26 U.S.C. 3121(d)(2); 42 C.F.R. § 1001.952.

125.   The Agreement's ¶4(C) shows that Halifax considered referrals from Dr. Kim's husband when it required that she not attempt to solicit any person *contracted* by Halifax to not fulfill their contractual responsibility with Halifax. Mr. Robbins's belief that Halifax sought to prohibit Dr. Kim from influencing her husband (a person contracted by Halifax) is based in part on the Agreement, which tacitly acknowledges her lack of influence on other Halifax contractors due to the fact she was a recent graduate of Halifax's residency program, had not previously managed a family medicine office practice, and had not worked since June 16, 2017.

---

[5]      Relator does not know whether she received FMLA benefits, or their impact on employee status. But even if she received up to the maximum 90-day FMLA pay, and if that continued her "employee" for up to 90 days, she was never an employee from November 2017 through January 2018.

-32-

126.    The Agreement also evidenced Halifax's bad intent by its omission of CIA-mandated compliance language. An earlier draft's absence of compliance language was noted in the September 27 PARC meeting as one of the reasons for the Committee's second rejection of the draft subsidy obligation waivers and signing bonus repayment waiver. The 2018 Agreement's final paragraph includes references to Dr. Kim's compliance with the Anti-Kickback Statute and Stark Law. But in spite of the Committee's direction to include required compliance language, the paragraph falls short of the CIA's requirement that the parties (not just the physician) certify that an agreement "shall not violate the Anti-Kickback Statute and the Stark Law." The omission indicates tacit acknowledgment of culpability and that the omission was intentional rather than inadvertent. Mr. Robbins knows General Counsel Gallo to be an otherwise detail-oriented lawyer who could not have accidentally overlooked Stark and Anti-Kickback certifications, especially given the affirmative duties imposed on her and her co-workers by the CIA.

### 2.  Halifax evidenced intent by falsifying the Contract Cover Sheet.

127.    One of the compliance tools used for physician contracts is the "Contract Cover Sheet." Ex. J (sample, redacted).

128.    Corporate counsel Vivian Gallo executed the Halifax Health Contract Cover Sheet, documenting approval of the 2018 Kim Agreement. It shows approval only by Vivian Gallo. The Contract Cover Sheet falsely states that the arrangement received the required Physician Arrangement Review Committee approval. Unlike other Health

Contract Cover Sheets, it is missing a certification of the fair market value and commercial reasonableness of the waivers of the practice subsidy and bonus repayment obligations, and is missing certification that documentation is properly included and verified.

129.   The Halifax Health Contract Cover Sheet for Dr. Kim's 2018 Agreement represented that the Physician Arrangements Review Committee had approved the Agreement on October 25, 2017. This is a false statement.

### 3. The Committee never fully studied or approved the waivers.

130.   Halifax failed to properly consider the waivers of Dr. Kim's practice subsidy obligation and her signing bonus repayment obligation.

131.   It failed to consider implications under the Anti-Kickback Statute and Stark Law because it failed to disclose – or to even consider – the fair market value of the benefit conferred to her or to even consider the waivers' commercial reasonableness.

132.   In violation of the CIA, Halifax conducted no fair market value study and made no determination of commercial reasonableness.

133.   Although Halifax serves charitable purposes, financial assistance is properly limited only to those with demonstrated financial need.

134.   Dr. Kim's draft agreement was *not* approved during the October 25 meeting. But the CIA requires review *and approval*:

> 2. ... Halifax shall create and maintain throughout the term of the CIA procedures reasonably designed to ensure that each existing and new or renewed Focus Arrangement does not violate the Anti-Kickback Statute and/or the Stark Law . . . (t)hese procedures shall include the following:

-34

...

    e. establishing and implementing a written review *and approval* process for all Focus Arrangements, the purpose of which is to ensure that all new and existing or renewed Focus Arrangements do not violate the Anti-Kickback Statute and Stark Law, and that includes at least the following: (i) a legal review of all Focus Arrangements by counsel with expertise in the Anti-Kickback and Stark Law, (ii) a process for specifying *the business need or business rationale for all Focus Arrangements*, and (iii) a process for *determining and documenting the fair market value of the remuneration specified in the Focus Arrangement*;

...

    g. implementing effective responses when suspected violations of the Anti-Kickback Statute and Stark Law are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments pursuant to Sections III.I and III.J when appropriate.

Ex. A at 2, CIA, § II.C.2 (emphasis added).

135.    Thus, waivers of Dr. Kim's obligations required PARC approval, which required documented FMV determination and a documented "commercial reasonableness" assessment.

**E. Drs. Zulfiqar and Kim Knew Their Stark and AKS Responsibilities**

136.    One purpose of the Halifax's offer to waive the subsidy repayment obligation and the signing bonus repayment obligation was to induce referrals. This waiver offer was later accepted by Dr. Kim and memorialized in the 2018 Agreement.

137.    By omitting the amount of the subsidy obligation from Dr. Kim's contract, Halifax and Dr. Kim disguised this non-fair market value remuneration benefiting her and her husband, Dr. Zulfiqar.

138.   Halifax reasonably anticipated future referrals from Dr. Zulfiqar and that business would be generated between it and Dr. Zulfiqar because of his and IMACS' past referrals and business generated.

139.   Halifax and Drs. Kim and Zulfiqar (the "parties") knew that one purpose of waiver was to induce referrals.

140.   As explained below, Drs. Kim and Zulfiqar knowingly and willfully solicited and then received remuneration in violation of the Anti-Kickback Statute. They knew or should have known that Anti-Kickback violations triggered False Claims Act liability.

141.   The parties knew that the contractual waiver of Dr. Kim's subsidy obligation created a Stark "financial relationship" between Halifax and Dr. Zulfiqar because Halifax was aware that the two doctors were married. The Halifax website displayed these doctors' marriage on its website. Exh G, Halifax website (Internet Archive showing September 18, 2015 page).

142.   Drs. Kim and Zulfiqar were familiar with the requirements imposed on them by the Stark Law and the Anti-Kickback Statute. As further detailed below, their knowledge of these laws was based on Halifax's CIA-imposed requirement to train physicians and have them certify the training, and on these doctors' respective contracts' that expressly stated these requirements and required acknowledgement of these laws.

143.   The CIA's affirmative "Corporate Integrity Obligations" required Halifax to

focus physician training on the requirements of the Anti-Kickback Statute and Stark

Law.

> a.   Arrangements that potentially implicate the Anti-Kickback Statute or
> the Stark Law, as well as the regulations and other guidance documents
> related to these statutes;
> d.   The legal sanctions under the Anti-Kickback Statute and the Stark
> Law; and
> e.   Examples of violations of the Anti-Kickback Statute and the Stark
> Law.

Ex. 1 at 11, CIA § III. C(2)

144.   The CIA required that those who received training certify the training received.

*Id* at 11, CIA § III. C(4).

145.   Dr. Zulfiqar's entity, IMACS agreed:

> to comply in all respects with the Medicare and Medicaid laws and
> regulations, including without limitation, the Anti-Kickback and fraud
> and abuse provisions thereof, and *no direct or indirect payments shall be
> made by one party to the other to induce, or in consideration of the
> referral by the other party of a Medicare or Medicaid patient.*"

Ex. D, IMACS Contract at 4, § 9 *Special Medicare Covenant*. [Emphasis supplied]

146.   IMACS agrees that all physicians currently affiliated with and who become

affiliated with IMACS will receive such training in each renewal year of the

agreement. Ex. D at 1, IMACS Addendum, §3(B). It further certified that all of its

physicians have reviewed Halifax Anti-Kickback and Stark Law policies and

procedures. Addendum page 1, §3(B).

147.   Dr. Kim's Employment Contract required certification that she had reviewed

the hospital's physician referral and Anti-Kickback and Stark Law policies and

procedures, § 18A; that she would receive compliance training, § 18(B); and that she

-37-

would comply with the Halifax Code of Conduct, § 12. Exh. E at 7, Kim Contract. Dr.

Kim agreed to:

> comply with those provisions of law that affect reimbursement for professional services rendered by the employee. Furthermore the employee will not, either by action or inaction, do or cause anything that would adversely *affect reimbursement payment to the district or which would adversely affect the District's Medicare provider status*."

Exh. E at 7, Contract ¶12.  [Emphasis supplied]

**F.  Halifax Files Zulfiqar-Referred Claims With Medicare**

148.    Halifax files claims with Medicare. For 2015, Medicare reports 6,074 Medicare

inpatients with an average charge of $43,281 each, totaling $263 million.

149.    As a hospital, and in particular because Halifax is an accredited level II trauma

center, it requires and regularly uses gastroenterology services, such as those

contracted for between it and IMACS, LLC, and provided by IMACS' doctors

including, Dr. Hassan Zulfiqar, Dr. Kim's husband. But gastroenterologists have less

need for hospitals. Halifax's cover memo for the 2010 IMACS contract explains:

> Gastroenterologists are not dependent on hospital services as most of their procedures are now performed in ambulatory centers. Our Emergency Department, Chest Pain Center, Clinical Decision Unit and Inpatient Services require that G.I. consults / services be available in a timely manner.

Ex. K, Halifax G.I. Coverage/Call Memorandum (for 2010 IMACS contract)

150.    Gastroenterologists can perform most of their services in either a hospital or an

ASC (Ambulatory Surgery Center). Relative to hospitals, one healthcare advantage of

ASCs is their patients usually don't risk as many infectious diseases. A taxpayer

benefit of ASC's relative to hospitals is lower reimbursement rates. *See generally* 42

C.F.R. Part 416. But hospitals' higher reimbursement rates give them resources and

motivation to incentivize gastroenterologists to perform procedures in hospitals, instead of ASC's.

151.    For many gastroenterology procedures, Medicare reimburses hospitals at approximately double the rate it reimburses ASCs. For example, for an endoscopic biopsy, HCPCS 43239, Medicare's facility outpatient payment to hospitals averages $700, but for ASCs only $378. For an endoscopic insertion of stomach tube, code 43246, Medicare's hospital facility outpatient payment is $1,335, but for ASCs only $609. For an endoscopic biopsy of large bowel, code 45380, Medicare's hospital outpatient facility payment is $878, but only $450 for an ASC. Ex. L, 2017 Procedural Reimbursement Guide.

152.    Medicare paid Dr. Zulfiqar for more than 200 of these procedures in 2015, and performed all of these procedures in a "facility."[6] CMS data does not reveal the facility in which these were performed. However, on information and belief, many, perhaps all were performed at Halifax. Ex. M. Mr. Robbins's belief is based in part on 2017 Halifax Hospital internal report showing Dr. Zulfiqar performed services at Halifax for 796 patients. Ex. H. *See* ¶ 162 below. Because a large percent of Halifax's revenue comes from Medicare and other government sources, it is a reasonable inference that Medicare or other government sources paid for a percentage of these 796 patients.

---

[6]     Medicare pays the hospital's facility payment, and the doctors' service payment. Data from CMS Public Use Files,Provider Utilization and Payment Data, Physician and Other Supplier, 2015. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier2015.html

153.    The 2011 Halifax IMACS contract for on-call patient services was $375,000 per year. Ex. D. The 2014 amended contract revised the services but continued at the same rate. Ex. F. The 2014 amendment envisioned the performance of Medicare services by these physicians because it required compliance training to comply with the CIA and specified that the agreement would terminate if IMACS or *any* of its affiliated physicians became subject to a proceeding to exclude or disbar from Medicare.

154.    In addition to the outpatient procedures discussed above, 2015 CMS Medicare part B claim data shows Medicare reimbursement to Dr. Zulfiqar, NPI 1487684171, for 543 "hospital inpatient care" evaluation and management services totaling approximately 346 hours for 400 beneficiaries during 2015. Ex. M. This data does not include Medicare part C services which he may also have performed at hospitals. Because Dr. Zulfiqar has privileges at two hospitals, this data also does not reveal how many of these patients were referred to him from Halifax or from him to Halifax.

Hospital Inpatient Care

| CPT code, description | Total services | total beneficiaries | total "typical" minutes |
|---|---|---|---|
| 99223, Initial, typically 70 min./day | 166 | 161 | 11,620 |
| 99231, Subsequent, typically 15 min./day | 51 | 44 | 765 |
| 99232, Subsequent, typically 25 min./day | 303 | 175 | 7,575 |
| 99233, Subsequent, typically 35 min./day | 23 | 20 | 805 |
| Totals | 543 | 400 | 20,765 |
| Total hours | | | 346 hours |

155. The Centers for Medicare and Medicaid Services also reports shared patient data showing providers who provided services to the same patient within 30 days. In 2015, it shows that Halifax and Dr. Zulfiqar shared 176 unique patients who first saw Dr. Zulfiqar and then Halifax, for a total of 508 times. Of the 508 services, 163 of these were on the same day. On information and belief, those patients were seen by him at the hospital.

156. On information and belief, many (or all) of these 508 services involve patients who were referred for hospital services from Dr. Zulfiqar to Halifax.

157. The same 2015 shared patient data set shows an additional 681 services provided first at Halifax for patients who then saw Dr. Zulfiqar within the next 30 days. On information and belief, many (or all) of those 681 services involve patients referred from Halifax to Dr. Zulfiqar.

158. Halifax's *Cases by Physician* report for January – December 2017, Exh. N, shows 3,751 IMACS cases, of which 21%, 796 cases were under Dr. Zulfiqar.

| | |
|---|---|
| Clinical patients | 64 |
| Emergency room patients | 1 |
| Inpatients | 370 |
| Observation patients | 95 |
| Recurring patients | 13 |
| Referred patients | 5 |
| Same Day Surgery patients | 248 |
| 2017 Zulfiqar total | 796 |

159. Notwithstanding Halifax's identification of only five patients as "referred," on information and belief, *Dr. Zulfiqar referred many or all* of those 796 patients to Halifax.

-41-

160.    Halifax's limited use of the term "referred" as patients steered or recommended to it has been characterized by the Eleventh Circuit Court of Appeals as *absurd*.[7] For Stark and Anti-Kickback Statute purposes, "referred" means authorization of care by a particular provider. For example, if a hospital calls a gastroenterologist with a request to look at one of its patients and the gastroenterologist then recommends a diagnostic or other procedure, those recommendations are referrals, even though the gastroenterologist did not steer the patient to the hospital. This is consistent with courts' and Congress's understanding that *a physician is a financial gatekeeper* as well as a medical one.

161.    On information and belief, government funds, including Medicare, paid for many of those 796 patients.

162.    On information and belief, Mr. Robbins believes 2015 and 2017 data is typical of other years relevant to this Complaint, because the IMACS contract that covered Dr. Zulfiqar and his professional colleagues renewed annually from 2011, and without change to the $375,000 annual payment in 2014.

163.    Halifax submits claims to federal health care programs for the technical component of the IMACS procedures without advising those payers of the kickbacks, which makes those claims false claims under the FCA.

---

[7]     Defining "referred" as recommended or steered "would lead to the *absurd* result that the first kickback payment for a referral is unlawful, but future kickback payments for the same patient are lawful because they are not for an initial "referral." *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013) (emphasis supplied).

## G. Halifax Acted "Knowingly" When it Certified FCA and CIA Compliance

164.   Both the FCA and the Florida FCA define "knowingly" as follows:

> the terms "knowing" and "knowingly" mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b); Fla. Stat. § 68.082(1)(c).

165.   Halifax knowingly concealed valuable benefits it conveyed to Dr. Kim by not performing market value or commercial reasonableness studies that would have documented the value of the waivers. Instead, it purposefully failed to make these routine inquiries.

166.   On information and belief, Halifax has failed to report its illegal conduct, to repay overpayments, to properly use the Legal IRO as required by the CIA, and has otherwise failed to comply fully and adequately with obligations imposed by the CIA.

167.   The CIA includes "Stipulated Penalties For Failure To Comply With Certain Obligations" as a contractual remedy for failures to comply with certain obligations. Among the stipulated penalties are:

- $2,500 daily penalty for failure to repay overpayments, report reportable events, § X(A)(1)(m) and (n);
- $2,500 daily penalty for failure to engage in use the Legal IRO as required, § X(A)(2);
- $2,500 daily penalty for failure to submit certain reports as required, § X(A)(3) and (4);
- $50,000 penalty for a certain false certifications, § X(A)(6); and

· a $1000 daily penalty for failure to "comply fully and adequately
with any obligation of this CIA.

168.   Halifax's false certifications to the United States, including certifications of
compliance with the CIA, are material misrepresentations in violation of conditions of
payment for federal and state health care programs.

169.   The false statements caused false claims to be paid or approved by Medicare,
Medicaid, and other government health care programs in violation of the FCA.

170.   Halifax expressly certified compliance with the provisions of the Stark Law
and Anti-Kickback statute when it signed provider applications and cost reports and
submitted them to the U.S. Government.

171.   Halifax "knowingly" violated the Stark Statute and the Anti-Kickback Statute
as such term is defined in the False Claims Act.

172.   Halifax presented or caused to be presented these claims with actual knowledge
of their falsity, or in deliberate ignorance or reckless disregard that such claims were
false and fraudulent.

173.   Under the False Claims Act, Halifax was not entitled to be paid for such claims
because they were false and/or fraudulent. It was not entitled to be paid for these
claims because it was not entitled to bill and/or forfeited the right to bill any federally
sponsored health-care program for items and services that it provided to the patients
referred to it by physicians in violation of the Anti-Kickback Statute and the Stark
statute.

-44-

**H. Halifax Retaliated Against and Wrongfully Discharged Mr. Robbins**

174.    Following Mr. Robbins' inquiry into Dr. Kim's contract, Halifax fired him and

even prohibited him from retrieving his personal effects such as family photos, degrees

an honors, and mementos from prior employment at law firms in DC It had security

escort him to the parking garage and observed him exit.

175.    Halifax offered a pretextual rationalization when it fired him. However, that his

investigation into Halifax's illegal activities played a primary, if not *only*, role in his

termination is shown by:

- the timing of the termination shortly after he learned of the 2018 agreement, but
  before the next PARC meeting,
- Halifax's refusing Mr. Robbins any opportunity to consider or rebut the reasons it
  gave for his termination, and
- Halifax's noncompliance with its own disciplinary procedures. Ex. O, Halifax
  Employee Handbook (*Just Culture* excerpt).

176.    Investigating fraud was not merely just doing his job—had Mr. Robbins

learned of the fraud and done nothing he could have incurred a risk of liability as a

knowing participant.

177.    Halifax terminated Mr. Robbins in retaliation for his actions to stop violations

of the CIA, the Anti-Kickback Statute, and the Stark Law which resulted in false

claims to government health care programs. Halifax terminated him because of acts

taken by him to report violations of the False Claims Act, and in retaliation for other

lawful acts taken by Mr. Robbins in furtherance of an action under the False Claims

Act and/or the reporting of unlawful conduct.

## IV.    Counts

### 1.  Presenting or Causing False or Fraudulent Claims, § 3729(a)(1)(A)

178.    Relator repeats and realleges the preceeding paragraphs as if fully set forth herein.

179.    All Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

180.    All defendants also made or caused claims which include materially misleading omissions in violation.

181.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### 2.  Halifax Defendants' False Records or Statements, § 3729(a)(1)(B)

182.    Relator repeats and realleges the preceding paragraphs as if fully set forth herein.

183.    The Halifax Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

184.   The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

185.   The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing claims for services to patients enrolled in Federal Programs where said services are unnecessary, unreasonable and/or not provided.

186.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### 3.  Halifax Avoided an Obligation to Refund, 31 U.S.C. § 3729(a)(1)(G)

187.   Mr. Robbins repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

188.   Halifax made reverse false claims in violation of § 3729(a)(1)(G)) by falsely certifying compliance with its CIA's reporting requirements in order to avoid its obligation to pay stipulated penalties under the CIA.  31 U.S.C. § 3729(a)(1)(G).

189.   The claims submitted by Halifax are also false because Halifax was in material breach of the CIA's compliance and reporting obligations at the time it submitted those claims.

190.   The Halifax Defendants knowingly made, used or caused to be made or used false records or false statements – *i.e.,* the false certifications made or caused to be made by Halifax –  material to an obligation to pay or transmit money to the

-47

Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

191.   The false statements or records misleadingly omit critical facts which constitute material misrepresentations.

### 4. Halifax's Retaliation Against Mr. Robbins, 31 U.S.C. § 3730(h)

192.   The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

193.   As alleged in above, Mr. Robbins engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

194.   Because of Mr. Robbins's lawful acts, Mr. Robbins was subjected to discrimination in the terms and conditions of his employment with Halifax Staffing, including but not limited to his wrongful termination, in violation of 31 U.S.C. § 3730(h).

195.   Halifax terminated Mr. Robbins in retaliation for his actions to stop violations of the Stark Law, Anti-Kickback Statute, and the CIA, which resulted in false claims to government health care programs.

196.   As a consequence of Defendants' violation of 31 U.S.C. § 3730(h), Mr. Robbins suffered damages.

197.   The Halifax Defendants' retaliatory acts have proximately caused Mr. Robbins to suffer and to continue to suffer substantial damage, including special damages, in an amount to be proven at trial.

### 5.  All Defendants' Violations of the Florida False Claims Act

198.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

199.    As described above, Defendants' acts violated one or more Florida statutes § 456.054 (prohibiting kickbacks), § 409.920(2)(a)(5) (prohibiting Medicaid provider kickbacks) and § 395.0185 (prohibiting rebates).

200.    By virtue of the acts described above, all Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State government for payment or approval.

201.    By virtue of the acts described above, all Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State government to approve and pay such false and fraudulent claims.

202.    The Florida State government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

203.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

204.    Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each

and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used  or presented by Defendants.

## V.    Prayer for Relief

WHEREFORE, *Qui Tam* Plaintiff, David Robbins, for the United States, for the State of Florida, and for himself, prays as follows and request:

A. That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B. That in the event the United States Government intervenes in this action, Mr. Robbins be awarded 25% of the proceeds of the action or the settlement of any such claim;

C. That in the event the United States Government does not proceed with this action, Mr. Robbins be awarded 30% of the proceeds of this action or the settlement of any such claim;

D. That under the Florida False Claims Act, the Court enter judgment against the Defendants for the maximum amount of damages and civil penalties available under the Florida False Claims Act; and award the maximum share permitted by law of all amounts recognized by that Act as a consequence of this action;

G. That Mr. Robbins be awarded all damages caused by Halifax's retaliation and wrongful termination of him, including but not limited to two times the amount of back pay owed to him, interest on such back pay, lost benefits, compensatory and punitive damages, and prejudgment interest to which he is entitled;

H. That Mr. Robbins be awarded all costs, attorneys' fees, and litigation expenses; and

I. That the United States Government, the State of Florida, and Mr. Robbins receive any and all other relief, both at law and in equity, to which they may reasonably appear entitled.

JURY DEMAND:  Plaintiff requests trial by jury.

Respectfully submitted

/s/ Jonathan Kroner
FBN 328677
Jonathan Kroner Law Office
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
305.310.6046
jk@FloridaFalseClaim.com

Attorney for *Qui Tam* Plaintiff Relator
David Robbins

## Service

This complaint will be filed under seal and **will not be served** on Defendants until the court lifts the seal.